IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RACHA FARHAT<br><br>Defendant. | Criminal Case No. 1:21-cr-112<br><br>The Hon. T.S. Ellis, III |

STATEMENT OF FACTS

The United States and the defendant, RACHA FARHAT (hereinafter, "the defendant"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

*Count 1: Conspiracy to Launder Monetary Instruments*

1. From at least in or about 2010 through at least in or about February 2021, in the Eastern District of Virginia and elsewhere, the defendant, together with others known and unknown, did unlawfully and knowingly conspire, combine, confederate and agree to transport, transmit, and transfer monetary instruments and funds from places outside the United States to and through places in the United States, knowing that at least some of the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed at least in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit: a felony violation of the International Emergency Economic Powers Act (IEEPA).

2. Hizballah ("Party of God," also transliterated from Arabic as Hizbullah or Hezbollah) is a Lebanon-based Shia Islamic organization with political, social, and terrorist

components. In 1997, the U.S. Department of State designated Hizballah a Foreign Terrorist Organization, pursuant to Section 219 of the Immigration and Nationality Act, and it remains so designated today. In 2001, pursuant to Executive Order 13224, the U.S. Department of the Treasury designated Hizballah as subject to the Specially Designated Global Terrorist ("SDGT") sanctions program.

3. Hizballah owns and operates Al Manar TV ("The Beacon"), a television station based in Lebanon that is designed to cultivate support for Hizballah's activities and mission. Through its broadcasts on Al Manar TV, Hizballah endeavors, among other things, to raise money and to recruit volunteers in furtherance of its unlawful activities.

4. On March 23, 2006, the U.S. Department of Treasury designated pursuant to Executive Order 13224 Al Manar TV as a Specially Designated National ("SDN") for the purposes of the SDGT sanctions program. Al Manar TV has remained an SDN subject to the SDGT sanctions program at all times since its initial designation. This designation blocks Al Manar TV's assets and prohibits U.S. persons from engaging in any transaction with Al Manar TV without first obtaining a license or other written authorization from the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"). This prohibition includes but is not limited to the making of any contribution or provision of funds, goods, or services, by, to, or for the benefit of any person who is subject to this sanctions regime, as well as the receipt of any contribution or provision of funds, goods, or services from any person subject to this sanctions regime. Violation of these sanctions is criminalized by the International Emergency Economic Powers Act ("IEEPA").

5. The defendant is a dual citizen of the United States and Lebanon. At all times relevant to the Information, the defendant was residing within the Eastern District of Virginia and was married to Hussam Hawi ("Hawi").

2

6. Unindicted coconspirator 1 (UCC-1) is a dual citizen of the United States and Lebanon residing in Lebanon. UCC-1 owns and operates the Lebanese company Master Computer Technology SARL ("Master Computer"). Master Computer does business at least in part by acquiring electronics equipment in the United States and reselling it to other entities located primarily in the Middle East and Africa.

7. One of UCC-1's and Master Computer's customers is Al Manar TV. UCC-1 and Master Computer used the defendant and other U.S.-based co-conspirators to purchase audio, video, and other equipment in the United States. After their purchase, the merchandise was consolidated, often at the shared residence of the defendant and Hawi, and then shipped overseas. Once overseas, UCC-1 sold some of it directly to Al Manar TV, and sold other items to front companies associated with Al Manar TV, in willful violation of U.S. laws. Over the course of the conspiracy, UCC-1 conducted at least (approximately) $175,653 U.S. Dollars' worth of business with Al Manar TV. Over the course of the conspiracy, UCC-1 caused approximately $1,400,160 to be transferred to the defendant.

8. The defendant, UCC-1, and Master Computer do not have licenses or other written authorization from OFAC permitting them to engage in transactions with Al Manar TV.

9. As part of the conspiracy, the defendant obtained quotes for electronics equipment at UCC-1's request. UCC-1 then obtained Al Manar TV's approval to proceed with the purchases.

10. When the defendant purchased the items, UCC-1 directed her to lie to the vendors about the intended destination of the items. As a result, the defendant falsely told vendors that the items were for a small, Virginia-based company called Master Computer, when in fact no such company existed in Virginia. One vendor asked to see Master Computer's facility in Virginia before completing the sale, prompting the defendant to seek a quote elsewhere. The defendant also

3

opened up a line of credit in a third party's name at an electronics supplier in order to make Master Computer purchases, and which obscured the defendant's involvement in the purchases.

11. The defendant paid for items purchased for Master Computer. She also paid to ship the items she purchased, as well as to ship all the items purchased by other U.S.-based co-conspirators. The defendant was reimbursed by UCC-1 through wire transfers, structured money orders, and other means. She was also frequently paid a commission on purchases ranging from two to four percent.

12. Over the course of the conspiracy, the defendant received approximately $1,192,000 in international wire transfers from UCC-1 and/or Master Computer in Lebanon for Master Computer related expenses. Approximately $521,000 of that total was wired into an account controlled by the defendant but in a third party's name ("the third party account"). The defendant used the third party account at least in part to conceal her involvement in the transactions.

13. At times, UCC-1 experienced difficulty sending money by wire transfer to the defendant. On October 15, 2014, UCC-1 told the defendant that Wells Fargo needed proof of "where the money is coming from and for what reason." UCC-1 went on to say, "[V]ery complicated these days, tell me if I can deposit it somewhere else."

14. Beginning in 2014, the defendant and other co-conspirators also received payment from UCC-1 in structured money orders. An unindicted, Florida-based co-conspirator (UCC-2) would purchase multiple money orders on the same day from different locations, all under $1000 in order to evade identification reporting requirements. UCC-2 sometimes purchased as many as seven money orders in the same day. UCC-2 then mailed the money orders to the defendant and other U.S.-based co-conspirators. In total, UCC-1 caused approximately $396,160 in structured

4

money orders to be paid to the defendant and her co-conspirators in this way. The defendant directly received approximately $78,160 in structured money orders. The defendant deposited these money orders into her personal checking account or the third party account. When other co-conspirators received the structured money orders, they sometimes wired the money to the defendant afterwards.

15. The defendant also received money that counted against UCC-1's expenses by filing a U.S. tax return on his behalf and claiming a refund. The tax return contained false information, such as that UCC-1 resided in Los Angeles, CA, when in fact the defendant knew that UCC-1 actually resided in Lebanon. The defendant deposited the tax refunds into the third party account.

16. After the goods were purchased, the defendant or another coconspirator consolidated them and shipped them overseas. The defendant took steps to conceal the nature of the transactions in the shipments, including by hiding certain electronics items inside the packaging for other items, underreporting the value of items, and by varying the names of the sender and recipient, even though all the items were from the defendant and being shipped to UCC-1.

17. At all times during the course of the conspiracy, the defendant possessed actual knowledge, or was willfully blind, to the fact that at least some of the money received from UCC-1 was the proceeds of some form of unlawful activity. In 2014, the defendant wrote to UCC-1 and told him that she no longer wanted to purchase items for him because "[Hawi] had a point about doing all of those transactions and the illegality of the transactions and the wired money." UCC-1 responded by e-mailing Hawi a list of precautions. These included: increasing use of the third party account, shipping using third party names, and omitting Master Computer's name on any shipment

to the defendant's home. UCC-1 then e-mailed the defendant to say that he would give her a raise in her commission from two percent to four percent. As a result, the defendant continued working with UCC-1 and Master Computer, and she was in fact paid her commission of four percent on many but not all occasions. Additionally, in 2017, Hawi discovered several structured money orders received by the defendant. Hawi told the defendant that she was laundering money, and advised her to close her accounts before the bank noticed. Hawi speculated to the defendant that the money was terrorist or Hezbollah money. Hawi told the defendant that he had confronted UCC-1 about the money laundering, and that UCC-1 had said Hawi was right. A few days later, the defendant told Hawi that she discussed the structured money orders with UCC-1. The defendant told Hawi that she had said to UCC-1: "This guy is laundering money. And you are using me. And I am stuck in the middle." Nevertheless, the defendant continued receiving money by various means from UCC-1, continued making purchases for Master Computer, and continued shipping goods overseas herself and paying for the shipment of goods by other coconspirators.

*Count Two: Conspiracy to Defraud the United States*

18.     From at least January 2015 through February of 2020, in the Eastern District of Virginia and elsewhere, the defendant, together with Hawi, did unlawfully and knowingly conspire to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of revenue: to wit, income taxes.

19.     At all times relevant to Count Two, the defendant was employed as a cultural advisor at the Saudi Arabian Cultural Mission ("SACM") in Fairfax, Virginia, located within the Eastern District of Virginia. The defendant earned wages for her work at the SACM. In 2015, the defendant's wages from the SACM were $31,000.00. In 2016, the defendant's SACM wages were

$39,400.00. In 2017, the defendant's SACM wages were $40,900.00. In 2018, the defendant's SACM wages were $38,400.00. In 2019, the defendant's SACM wages were $39,400.00.

20. Hawi was aware of the defendant's employment and wages. The defendant and Hawi agreed to conceal her wages from the IRS to avoid paying taxes.

21. For each tax year referenced above, the defendant filed a joint tax return ("tax return") with Hawi. On or about April 26, 2016, they filed their U.S. Individual Income Tax Return, Form 1040, for calendar year 2015. On or about February 25, 2017, they filed their U.S. Individual Income Tax Return, Form 1040, for calendar year 2016. On or about February 24, 2018, they filed their U.S. Individual Income Tax Return, Form 1040, for calendar year 2017. On or about March 29, 2019, they filed their U.S. Individual Income Tax Return, Form 1040, for calendar year 2018. And on or about February 21, 2020, they filed their U.S. Individual Income Tax Return, Form 1040, for calendar year 2019.

22. Each year the defendant and Hawi willfully deceived the IRS by listing the defendant's occupation as a "stay home mom" and failing to report any income that she had earned from the SACM on their tax return. The defendant and Hawi electronically signed each tax return. Hawi electronically filed each tax return from their home in Vienna, Virginia. Their home is located within the confines of the Eastern District of Virginia.

23. As a result of these willful misstatements and omissions from their tax returns, the defendant and Hawi received a tax refund for each tax year. The tax due to the IRS because of the misrepresentations by the defendants for tax years 2015-2019 is approximately $64,991.

*With Respect to Counts One and Two:*

24. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the

defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

25. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

Date: Click to enter a date.         By: _____
Anthony T. Aminoff
Dennis M. Fitzpatrick
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, RACHA FARHAT, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
RACHA FARHAT

I am Elizabeth Mullin, defendant's attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

_____
Elizabeth Mullin
Attorney for RACHA FARHAT